**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Southern Division**

<table>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>ARELIS TINOCO,</td><td>*</td><td></td></tr>
<tr><td>    Plaintiff,</td><td>*</td><td></td></tr>
<tr><td>v.</td><td>*</td><td>Case No.: GJH-16-752</td></tr>
<tr><td>THESIS PAINTING, INC.,</td><td>*</td><td></td></tr>
<tr><td>    Defendant.</td><td>*</td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
</table>

\* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM OPINION**

This action stems from Plaintiff Arelis Tinoco's discrimination claims against her former employer, Defendant Thesis Painting, Inc., for purported violations of Chapter 27 of the Montgomery County Code. Pending before the Court is Defendant's Motion for Summary Judgment, ECF No. 39, and Motion to Strike Declaration and In Limine, ECF No. 58. A hearing is unnecessary. Loc. R. 105.6 (D. Md. 2016). For the reasons stated below, the Court will grant in part and deny in part Defendant's Motion for Summary Judgment and deny Defendant's Motion to Strike.

**I.      BACKGROUND[1]**

Defendant Thesis is a woman-owned business that offers commercial painting and wall-papering services. ECF No. 39-12 ¶¶ 2, 8. Thesis employed Plaintiff Arelis Tinoco from March 26, 2014 to March 2, 2015 as a cleaner/painter's assistant. ECF No. 57-1 ¶ 2. While working on projects for Thesis, Ms. Tinoco worked in a predominately male environment. ECF No. 57-1 ¶ 7.

---

[1] These facts are either undisputed or viewed in the light most favorable to the Plaintiff. Because Defendant's Motion to Strike, ECF No. 58, is denied for the reasons discussed below, this background section includes citations to Ms. Tinoco's declaration, ECF No. 57-1. As necessary, Defendant's Rule 56(e) objections to Ms. Tinoco's declaration are addressed in the footnotes of this section.

Ms. Tinoco is "pretty and feminine," ECF No. 39-8 ¶ 3, and she dressed differently than her colleagues, ECF No. 39-19 ¶ 4.

When it hired Ms. Tinoco, Thesis promised to train her as a painter. ECF No. 57-1 ¶ 3; ECF No. 40-12 ¶ 7. Thesis co-owner, Angelo Spyridakis, told Ms. Tinoco that he would instruct the foremen to assign her painting jobs and provide her with training. ECF No. 57-1 ¶ 36. When she complained to Mr. Spyridakis around December 2014 that she had not yet received this training, he told her that he did not want to keep her as a $13.00 an hour cleaner when she could work at McDonalds for $10.00 an hour and not have to put up with the hours, physical labor, and dirt that come with a job in construction. ECF No. 40-12 ¶ 7. He apparently intended this comment to mean that the company planned to train Ms. Tinoco as a painter, *id.*, but Ms. Tinoco understood the comment to be dismissive of her complaint, ECF No. 57-1 ¶ 6. Ms. Tinoco never received the training that she had been promised, and she observed that training and painting job opportunities were given only to men. ECF No. 57-1 ¶ 3.

## A. Disparaging sexual rumors

While Ms. Tinoco worked as a cleaner, Thesis employees made sexual comments about her and spread rumors about her that were of a sexual nature. *See e.g.*, ECF No. 39-11 ¶ 6; ECF No. 39-13 ¶ 7; ECF No. 39-14 ¶ 4; ECF No. 39-17 ¶ 7; ECF No. 39-18 ¶ 6. For example, a Thesis foreman, Carlos Amaya, heard a false rumor that he "was having sexual relations" with Ms. Tinoco. ECF No. 39-17 ¶ 7. Mr. Amaya did not bring this false rumor to the attention of higher-level management, *id.*, but word of it reached Barbara Spyridakis, Thesis's President, through an anonymous source. ECF No. 40-11 ¶ 4.

Thesis employees also spread a rumor that Ms. Tinoco would perform sexual favors for $100. *See e.g.*, ECF No. 39-11 ¶ 6; ECF No. 39-17 ¶ 7. The crew member that began this

prostitution rumor, Edgar Urquidi (nicknamed Cachito), falsely told Thesis employees that "he'd had sex with Ms. Tinoco." ECF No. 39-11 ¶ 6. Urquidi also disparaged Ms. Tinoco by telling his coworkers that she had sex with him in the presence of her daughter, ECF No. 40-6 at 7, and that she charged him $100, ECF No. 57-1 ¶ 9.[2] The disparaging prostitution rumor was widespread enough that a cargo elevator operator told Ms. Tinoco that he heard people talking about her selling sexual favors, ECF No. 57-1 ¶ 10, and a new painter who had never worked with Ms. Tinoco before asked for "the girl who charges $100," ECF No. 57-1 ¶ 12.[3]

These experiences impacted Ms. Tinoco emotionally; she had frequent headaches, sleepless nights, and an irregular appetite. ECF No. 57-1 ¶ 13.

### B. Sexual propositioning

In January 2015, Ms. Tinoco was working at the Twinbrook project. ECF No. 40-6 at 10. The Twinbrook project had no foreman. *Id.* Ms. Tinoco believed that Elmer Lazo, who was the foreman working on a project closest to the Twinbrook Project, functioned as the Twinbrook's foreman. *Id.* During this time, Mr. Lazo sent sexual text messages to Ms. Tinoco, at least some of which made her uncomfortable. ECF No. 57-1 ¶ 16–21; ECF No. 57-3; ECF No. 40-7 at 2.[4] Mr. Lazo used a company phone to send these messages. ECF No. 40-3. On January 12, 2015, Mr. Lazo messaged Ms. Tinoco at 6:25 AM "when we gonna fuck." ECF No. 57-3 at 10. Ms.

---

[2] Defendant argues that these facts are supported by inadmissible hearsay, ECF No. 59 at 4, but Urquidi's comments would be admitted, not for the truth of the matter asserted (i.e. that he had sex for $100 with Ms. Tinoco in the presence of her daughter), but to show that rumors were being spread about the Plaintiff.

[3] Defendant argues that these comments are inadmissible hearsay. ECF No. 59 at 4. The Court notes that in evaluating Defendant's Motion for Summary Judgment, it will not rely on the elevator operator's or new painter's comments for the truth of the matter asserted, but instead only to consider the pervasiveness and severity of the prostitution rumor.

[4] Defendant disputes that Mr. Lazo's text messages made Ms. Tinoco uncomfortable, claiming instead that the two Thesis employees mutually sent each other text messages, which contained sexual content. ECF No. 40 ¶ 6–7. Specifically, Defendant cites Mr. Lazo's claim that on January 13, 2015, Ms. Tinoco sent him a photo of a naked woman straddling a naked man. ECF No. 40-5 ¶ 7. Mr. Lazo says he deleted the photo but responded to it with "something like 'That's the way I like it' or 'when do we take a picture like that.'" *Id.* ¶ 7; See also ECF No. 40-3 at 2. At the Summary Judgment stage, the Court views disputed facts in the light most favorable to the plaintiff as the non-moving party.

Tinoco responded that she was going into work at 7:00AM. In response, Mr. Lazo told Ms. Tinoco that he would pay her for the day if she would not go into work so they could have sex. *Id.* He insisted that she "better take [the] offer," *id.* at 11, and when she deflected, he propositioned her again: "u didn't want me 2 pay u for the day." *Id.* She replies, "I'm afraid not to show up to work." *Id.* During this exchange, in which Mr. Lazo pressured Ms. Tinoco to allow him to pay her for sex and to convince her not to go into work, Ms. Tinoco asked Mr. Lazo "what do you want" and texted him "you scare me." *Id.* He continued, "how u want me 2 convince u" and "wats the problem." *Id.* at 12. When Ms. Tinoco responded that she never thought Mr. Lazo wanted "to sleep with" her, Mr. Lazo said "I thought of it cuz those idiots at that company cuz they talkin shit for no reason."

Despite Ms. Tinoco's deflections and her "you scare me" text, Mr. Lazo continued to message her throughout the day: at 8:09AM, "don't tell me u gonna bail," at 9:29AM "u made up ur mind or u still thinkin bout it," at 3:52PM "when can i c u," and at 4:07PM "u gonna leave me wantin 2 make love 2 u thats so mean baby." *Id.* at 12. Mr. Lazo texted Ms. Tinoco again on January 14, 2015, but Ms. Tinoco never responded. ECF No. 57-3 at 14.

Thesis has written policies related to "no call/no show absences from work." ECF No. 40 ¶ 4. Specifically, "[e]mployees are expected to be at work on time and should plan their commute accordingly. If an employee arrives late, leaves early, or otherwise alters his/her normal work schedule without prior approval from management, he/she will only be paid for the hours worked or be expected to make up this time. Any time missed or not made up will be unpaid." ECF No. 40-1 at 12. Further, "[a]ny employee who fails to maintain an acceptable attendance record will be subject to disciplinary actions, unexcused absence or tardiness may affect future promotions and/or raises." *Id.*

As a foreman, Mr. Lazo was responsible for informing Thesis ownership about who worked on a particular day. ECF No. 57-3 at 2–3. He thus had the power to report that Ms. Tinoco worked even if she took him up on his "offer" to not go into work. *Id.* In addition to reporting attendance, foremen review employees' timecards, ECF No. 57-1 ¶ 24, ensure all job reports were "completed accurately, honestly, and on time," ECF No. 57-4 at 2, and are empowered to discipline and possibly dismiss employees at the job site, *id.*, ECF No. 57-1 ¶ 37. Foremen also provided instructions on how and where painters and painter's assistants should work. ECF No. 57-1 ¶ 33. At staff meetings, Mr. Spyridakis would ask foremen to stand so that they could be seen by all staff and employees would know from whom they should take instructions on the job. ECF No. 57-1 ¶ 32.

### C.  Response from Thesis Leadership

Thesis has written policies related to non-harassment and non-discrimination. ECF No. 40-1. The policy is written in English and there is no written Spanish-translation. ECF No. 57-2 at 10. Mr. Lazo could not read or understand the policy. ECF No. 57-2 at 10. When asked what was explained about the policy to him in Spanish, Mr. Lazo testified "well, she says that this was – well I don't remember what it was. She just asked us to sign it." *Id.* A number of Thesis's other foremen speak Spanish as their first language and chose to write their affidavits to the Court in Spanish rather than English. *See e.g.*, ECF No. 39-11; ECF No. 39-17; ECF No. 39-19.

On January 23, 2015, Ms. Tinoco complained to Barbara Spyridakis that Mr. Lazo had propositioned her for sex and that other Thesis employees had spread disparaging, sexual rumors about her. ECF No. 57-1 ¶ 22; ECF No. 40-11 ¶¶ 7–8. Ms. Spyridakis assured Ms. Tinoco that she would investigate the matter and that this type of conduct would not be tolerated by Thesis. ECF No. 40-11 ¶¶ 5–8.

Ms. Spyridakis and Mr. Spyridakis met with Mr. Lazo on January 26, 2015. *Id.* ¶ 12. Ms. Spyridakis advised Mr. Lazo to stop any non-job-related communications with Ms. Tinoco. *Id.* She also explained that "retaliation was not allowed and would not be tolerated and further incidents or retaliation could lead to his termination." *Id.* Thesis investigated Ms. Tinoco's complaint, *id.* ¶¶ 14–17, and Ms. Spyridakis began monitoring Mr. Lazo's company phone records to ensure that he stopped communicating with Ms. Tinoco, *id.* ¶ 22. On February 2, 2015, Thesis held a sexual harassment training session for its foremen and other management employees. *Id.* ¶¶18–19.

Shortly after she complained to Ms. Spyridakis, Ms. Tinoco's hours were drastically reduced. ECF No. 57-1 ¶ 23. Thesis's business is seasonal because painting and wallpapering cannot be accomplished unless project sites are conditioned to at least 45 degrees Fahrenheit. ECF No. 40-10 ¶ 8. Thesis consistently reduces employees' hours during the less-busy December through April season. *Id.* ¶ 7. Consistent with that historical practice, Thesis reduced the number of employees it had working in the field in early 2015. ECF No. 40-5. The timeframe for when Ms. Tinoco's hours were cut overlapped with this seasonal decline in Thesis's work. Additionally, at that time, Thesis had two ongoing projects that required security clearances, which could be obtained only by American citizens. 40-10 ¶ 8. Because Ms. Tinoco is not an American citizen, Thesis could not offer her work on these two projects. *Id.*

Ms. Spyridakis claims that after receiving Ms. Tinoco's complaint, she confirmed Ms. Tinoco and Mr. Lazo would not be assigned to work on any of the same projects. ECF No. 40-11 ¶ 13. However, when Ms. Tinoco received her first work assignment after her January conversation with Ms. Spyridakis, she learned that Mr. Lazo was assigned to the same project. ECF No. 57-1 ¶ 25. When she learned that she had been assigned to work on the same project as

Mr. Lazo, she felt compelled to resign. ECF No. 57-1 ¶ 24. On February 25, 2015, Ms. Tinoco

did not report to work as scheduled, and on March 5, 2015 Thesis received a letter from Ms.

Tinoco's counsel regarding her discrimination claims. ECF No. 40-11 ¶ 24.

### D. Procedural background

On June 24, 2015, Ms. Tinoco filed a Charge of Discrimination with the Montgomery

County Human Rights Commission alleging hostile work environment harassment and

constructive discharge. ECF No. 58-3. She filed a complaint on January 20, 2016 in the Circuit

Court for Montgomery County, Maryland. Defendant removed the matter to this Court on March

15, 2016. The parties conducted discovery, although Thesis chose not to depose Ms. Tinoco.

Thesis moved for summary judgment. ECF No. 39. Ms. Tinoco filed an opposition, ECF No. 57,

which she supported with a declaration, ECF No. 57-1. Thesis replied, ECF No. 59, and moved

to strike Ms. Tinoco's declaration, ECF No. 58. Plaintiff opposed Defendant's Motion to Strike

or in Limine, ECF No. 60, and Defendant replied. ECF No. 61.

## II.    STANDARD OF REVIEW

Summary judgment is proper if there are no issues of material fact and the moving party

is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct.

2548, 91 L.Ed.2d 265 (1986); *Francis v. Booz, Allen & Hamilton, Inc.,* 452 F.3d 299, 302 (4th

Cir. 2006). A material fact is one that "might affect the outcome of the suit under the governing

law." *Spriggs v. Diamond Auto Glass,* 242 F.3d 179, 183 (4th Cir.2001) (quoting *Anderson v.*

*Liberty Lobby, Inc.,* 477 U.S. 242, 248, (1986)). A dispute of material fact is only "genuine" if

sufficient evidence favoring the non-moving party exists for the trier of fact to return a verdict

for that party. *Anderson,* 477 U.S. at 248–49. However, the nonmoving party "cannot create a

genuine issue of material fact through mere speculation or the building of one inference upon

another." *Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir.1985). The Court may rely on only facts supported in the record, not simply assertions in the pleadings, in order to fulfill its "affirmative obligation . . . to prevent 'factually unsupported claims or defenses' from proceeding to trial." *Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir.1987). When ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Anderson,* 477 U.S. at 255.

## III. DISCUSSION

### A. Motion to Strike and In Limine

Because it raises preliminary issues regarding the evidence to be considered in resolving Defendant's Motion for Summary Judgment, the Court must first address Defendant's Motion to Strike. ECF No. 58.

In November 2017, Ms. Tinoco responded to Interrogatories, including requests that she "set forth in detail and with particularity every action" constituting harassment or discrimination, ECF No. 40-1 at 5, and her basis for the contention that Mr. Lazo was her supervisor, ECF No. 40-1 at 9. Without waiving objections, including an overbreadth objection, Ms. Tinoco responded to these interrogatories.

In response to the interrogatory about the actions constituting harrassment, she disclosed that "during the course of employment" and "at worksites" she was "subject to mockery, insults, propositions for sex" and "further instances of harassment and discrimination." ECF No. 40-6 at 6. She disclosed that "Edgar Urquidi spoke of her as the woman who'd have sex for $100," and that he "even said he had had sex in the presence of Plaintiff's daughter." *Id.* She did not disclose details that appeared in her declaration about her interactions with a cargo elevator operator or a new painter who came looking for "the girl who charges $100." ECF No. 57-1 ¶ 10, 12.

Although Ms. Tinoco did not disclose these details in her interrogatory response, they were discussed in her Complaint. ECF No. 6 ¶¶ 18–19. Ms. Tinoco supported elements of her Opposition to Defendant's Motion for Summary Judgment with a declaration, ECF No. 57-1, which also included these details.

In response to the request regarding Mr. Lazo's supervision, Ms. Tinoco disclosed that she believed Mr. Lazo was the functional foreman on the Twinbrook Project, and that she believed Mr. Lazo had the authority to terminate Twinbrook project employees. ECF No. 40-6 at 9. She did not disclose other details about how foremen generally, and Mr. Lazo specifically, would assign her job duties and provide instructions on projects. She also did not disclose that she witnessed foremen disciplining painters on worksites or that foremen would review her timecard before it was submitted to Thesis. She did not disclose that Thesis leadership introduced foremen at staff meetings or that she worked directly under Mr. Lazo on another project weeks before he propositioned her. Ms. Tinoco's declaration, ECF No. 57-1 included these details.

Thesis did not depose Ms. Tinoco. Defendant noted the deposition for March 15, 2018—two months after filing its Motion for Summary Judgment. But Defendant cancelled the deposition on March 14, 2018 for an unknown reason and never rescheduled.

In this context, Thesis claims that paragraphs 7–10, 12, and 32–38 of Ms. Tinoco's declaration should be struck for two primary reasons. First, Thesis argues that the sham affidavit rule applies because these parts of the declaration contradict Ms. Tinoco's sworn written discovery statements. Second, Thesis argues that the declaration introduces new facts in violation of Federal Rule of Civil Procedure 37(c)(1). The Court addresses each argument in turn.

### 1. Sham affidavit rule

"A party who has been examined at length on deposition" cannot "raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony." *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984). This rule preserves "the utility of summary judgment as a procedure for screening out sham issues of fact." *Id.* However, courts "carefully limit" application of the sham affidavit rule "to situations involving flat contradictions of material fact." *Elat v. Ngoubene*, 993 F. Supp. 2d 497, 528 (D. Md. Jan. 21, 2014) (internal quotations ommitted); *see also Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 n.7 (4th Cir. 2001) (finding the sham affidavit rule inapplicable where it was ambiguous whether an affiant's declaration contradicted his prior testimony, meaning no "bona fide inconsistency" had been identified). The sham affidavit rule is inapplicable here because Ms. Tinoco was neither examined at length on deposition nor has she raised an issue of material fact that flatly contradicts her prior testimony.

### 2. Rule 37(c)(1)

Under Rule 37(c)(1), "[i]f a party fails to provide information as required by Rule 26(e), the party is not allowed to use that information . . . to supply evidence on a motion . . ., unless the failure . . . is harmless." Fed. R. Civ. P. 37(c)(1). Here, however, Rule 37(c)(1) is inapplicable to much of the information that Defendant contends was previously withheld. Defendant argues, for example, that Ms. Tinoco improperly withheld that she "was subject to 'sexual comments on the job, sometimes on a daily basis, but at least on a weekly basis,'" that "her male colleagues 'regularly made sexually harassing statements,'" and that "Edgar made 'the false and disparaging statement to his coworkers that 'I went out with Areli and she charged me $100 and she took me to the apartment where her daughter also was,'" ECF No. 58-1 at 2. But, these statements are just

different ways of phrasing exactly what was disclosed in response to Interrogatory Six. ECF No. 40-6 at 6. Specifically, Ms. Tinoco disclosed that "during the course of employment" and "at worksites" she was "subject to mockery, insults, propositions for sex" and "further instances of harassment and discrimination." ECF No. 40-6 at 6. She also disclosed that "Edgar Urquidi spoke of her as the woman who'd have sex for $100," and that he "even said he had had sex in the presence of Plaintiff's daughter." *Id.*

Similarly, Thesis was on notice about Ms. Tinoco's claims that a cargo elevator operator and new painter had heard disparaging sexual rumors about her because this information was disclosed in the Complaint. If Thesis required more specific details about these allegations, wanted to learn more about the "further instances of harassment and discrimination" disclosed by Ms. Tinoco, or wanted to interrogate the allegations' credibility, it could have requested that information through more specific interrogatories or at a deposition.

Further, to the extent that, as here, an interrogatory seeks "every fact which supports identified allegations," it will generally be found overbroad and unduly burdensome. *Proa v. NRT Mid-Atl., Inc.*, No. CV AMD-05-2157, 2008 WL 11363286, at *14 (D. Md. June 20, 2008); *see also Hiskett v. Wal–Mart Stores, Inc.*, 180 F.R.D. 403, 405 (D. Kan. 1998); *Clean Earth Remediation and Constr. Serv., Inc. v. Am. Int'l Group, Inc.*, 245 F.R.D. 137, 141 (S.D.N.Y. 2007). Ms. Tinoco objected to certain interrogatories on this basis. ECF No. 40-6 at 5, 10.

Where Rule 37(a) does apply, courts determine whether nondisclosure of evidence is harmless by considering "(1) the surprise to the party against whom [the evidence is raised]; (2) the ability of the party to cure that surprise; (3) the extent to which allowing the testimony would disrupt the trial; (4) the explanation for the party's failure to [disclose previously]; and (5) the importance of the testimony.'" *Southern States Rack and Fixture v. Sherwin–Williams Co.,* 318

F.3d 592, 596 (4th Cir.2003)). In light of these factors, Ms. Tinoco has demonstrated that her failure to disclose certain details relevant to whether Mr. Lazo was her supervisor is harmless.

Although the details provided by Ms. Tinoco supplement her prior general response about why she believed Mr. Lazo was her supervisor, they flow from that general response and should not come as a surprise to Thesis. For example, Ms. Tinoco detailed in her declaration that foremen typically trained new employees, gave employees instructions on jobsites, and had disciplinary authority. Ms. Tinoco previously disclosed that she believed Mr. Lazo served as the functional foreman of the Twinbrook Project and therefore was her supervisor. Ms. Tinoco thus disclosed that she had a general belief that foremen acted as worksite supervisors. And Thesis, as the employer, knows what specific tasks—whether training, instructing, or disciplining—its foremen take on. In fact, Ms. Tinoco's observations about foremen's duties are consistent with Mr. Lazo's deposition testimony and the Thesis job description. ECF No. 57-3; ECF No. 57-4. Similarly, Thesis keeps a schedule book and knows whether or not Mr. Lazo and Ms. Tinoco were assigned to the same French embassy project before their January 2015 text exchange. ECF No. 40-8.

Thesis had an opportunity to cure any surprise by refuting facts in Ms. Tinoco's declaration in its reply brief. Further, Thesis could have avoided any surprise by deposing Ms. Tinoco to ask specific questions about her general interrogatory responses. Allowing the declaration to be introduced has no disruptive effect and there is no doubt that the evidence is relevant. Even though Ms. Tinoco, the non-disclosing party, has not provided an explanation for the failure to disclose except that the newly disclosed details flow naturally from the complaint and prior discovery, the factors still weigh in favor of allowing the declaration.

In any case, at the summary judgment stage, the court views disputed facts in the light most favorable to the non-moving party. Here, none of the newly disclosed details provide the only record evidence in support of any element of Plaintiff's claims. Specifically, Ms. Tinoco's interrogatory responses, Mr. Lazo's deposition testimony, and the foreman job description all support Ms. Tinoco's contention that Mr. Lazo was her supervisor. Thus, viewing the facts in the light most favorable to Ms. Tinoco, the Court would still analyze Defendant's Motion for Summary Judgment with the assumption that Mr. Lazo served as Ms. Tinoco's supervisor.

Taken together, the declaration does not cause Thesis any prejudice, and its Motion to Strike or In Limine will be denied.

## B. Motion for Summary Judgment

### 1. Hostile Workplace[5]

Thesis is not entitled to judgment as a matter of law on Ms. Tinoco's hostile workplace claim because genuine issues of material fact exist as to the claim and Thesis's *Faragher/Ellerth* affirmative defense.

#### a. Prima facie claim

"To establish a Title VII claim for sexual harassment in the workplace, a female plaintiff must prove that the offending conduct (1) was unwelcome, (2) was based on her sex, (3) was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive

---

[5] As discussed in a previous memorandum issued in this case, ECF No. 28 at 11 n.6, Plaintiff "cannot, through the use of motion briefs, amend the complaint." *Zachair Ltd. v. Driggs*, 965 F. Supp. 741, 748 n. 4 (D.Md.1997). Thus, although Plaintiff's Opposition to Defendant's Motion to Dismiss and Opposition to Defendant's Motion for Summary judgment discuss a quid pro quo sexual harassment claim, such a claim is not properly before the Court. The facts relevant to a quid pro quo sexual harassment claim are still relevant, however, to Plaintiff's properly pled hostile work environment, constructive discharge, and retaliation claims.

work environment, and (4) was imputable to her employer." *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 331 (4th Cir. 2003).[6]

Viewing the facts in the light most favorable to Ms. Tinoco, genuine disputes of material fact exist as to each of these elements. Ms. Tinoco has provided sufficient evidence to dispute Thesis's contention that the offending conduct was welcome—she complained to foreman Nelson Caceres, ECF No. 39-11 ¶ 6, and higher-level management, ECF No. 57-1 ¶ 22; ECF No. 40-11 ¶¶ 7–8; she told Mr. Lazo "you scare me," ECF No. 57-3 at 10; and both the false prostitution rumor and rumor that Ms. Tinoco had sex with a crew member in front of her daughter are disparaging (i.e. unwelcome) on their face.

Ms. Tinoco has similarly introduced sufficient facts to dispute Thesis's position that the offending conduct was not based on her gender. Thesis is a predominately male environment, and Ms. Tinoco's colleagues noticed that she is "pretty and feminine," ECF No. 57-1 ¶ 7, and that she dressed differently than her (mostly male) colleagues, ECF No. 39-19 ¶ 4. Further, Ms. Tinoco presents evidence that her complaints about not being trained as a painter while her male colleagues enjoyed such training were dismissed because Mr. Spyridakis thought she would want to avoid the physical labor and dirt on a construction site. ECF No. 40-12 ¶ 7. Finally, the offending conduct was of a sexual nature. Although, workplace harassment is not "automatically discrimination because of sex merely because the words used have sexual content or connotations," *Lack v. Wal-Mart Stores, Inc.*, 240 F.3d 255, 260 (4th Cir. 2001), Ms. Tinoco has presented sufficient evidence that she was singled out for sexual rumor-mongering and propositioning because of her status as a woman.

---

[6] Plaintiff alleges claims under the Montgomery County Code, which mimics Title VII. Thus, the Court applies Title VII case law to analyze the claims. *See Whittaker v. David's Beautiful People, Inc.*, No. CV DKC 14-2483, 2016 WL 429963, at *2 n.2 (D. Md. Feb. 4, 2016)(citing *Haas v. Lockheed Martin Corp.*, 396 Md. 469, 504 (2007) ("Considering the mimicry of state and local laws to Title VII, it is appropriate to consider federal precedents when interpreting state and local laws.").

Further, enough evidence exists such that a jury could find that the offending conduct was severe or pervasive enough to alter the conditions of her employment and create an abusive work environment. When analyzing this element, courts "look at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *E.E.O.C. v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 176 (4th Cir. 2009). Because "[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed," no single factor is determinative. *Id.* (citing *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 82 (1998).

The facts support a conclusion that Ms. Tinoco's supervisor asked her to exchange sex for a material benefit—the ability to be paid on a day when she did not go into work and to not have the day-off reported per Thesis's absence policy. ECF No. 57-3 at 10. Being pressured by one's supervisor to have sex for paid time off could be found by a jury to constitute severe harassment. Such propositioning is humiliating and demeaning and, not a mere offensive utterance. Further, Ms. Tinoco introduced sufficient evidence that Ms. Lazo's proposition unreasonably interfered with her work performance. Specifically, when she learned that Thesis reassigned her to work with Mr. Lazo, she felt compelled to resign. ECF No. 57-1 ¶ 24

The facts would also support a jury finding that the offending conduct was pervasive. In *Allen v. TV One, LLC*, a district court found that a female employee had been subjected to a pervasive pattern of sexual harassment and gender discrimination. No. CV DKC 15-1960, 2017 WL 4404408 (D. Md. Oct. 4, 2017). There, an employer's board member repeatedly said she wanted the employee-plaintiff to marry her son who was the President of the organization. *Id.* at

7. She would introduce the employee-plaintiff as her "future daughter-in-law" and state her desire that the plaintiff marry her son in front of colleagues. *Id.* The board member's conduct fueled workplace rumors of a false romantic relationship. *Id.* The plaintiff then heard these rumors from multiple colleagues. Similarly, here, the far-less benign rumors that Ms. Tinoco was willing to prostitute herself for $100 were frequent and widespread enough that a cargo elevator operator told Ms. Tinoco that he heard people talking about her selling sexual favors, ECF No. 57-1 ¶ 10, and a new painter who had never worked with Ms. Tinoco before asked for "the girl who charges $100," ECF No. 57-1 ¶ 12. Further, when Mr. Lazo propositioned Ms. Tinoco, he told her he "thought of it cuz those idiots at that company cuz they talkin shit for no reason." ECF No. 57-1 ¶ 12. At the summary judgement stage, it is a justifiable inference to read this text to mean that Mr. Lazo thought to proposition Ms. Tinoco because of rumors he heard from people at work. Thus, as in *Allen*, the creation of these rumors were also sufficiently pervasive to create an abusive working environment and  alter the conditions of her employment.

Genuine issues of material fact also exist as to employer liability. Where a plaintiff is harassed by her supervisor and the supervisor takes a tangible employment action, the employer may be held strictly liable for the harassment. *Vance v. Ball State Univ.*, 570 U.S. 421, 440 (2013). If no such tangible action is taken against a plaintiff, the imputability test is a negligence standard, with liability attaching if "the employer knew or should have known about the harassment and failed to take effective action to stop it." *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 334 (4th Cir. 2003).

Evidence exists to suggest Mr. Lazo harassed Ms. Tinoco while in a supervisory role and offered Ms. Tinoco a paid day off—a tangible benefit that he could provide to her because foremen were in charge of reporting absences to higher level management and he was the functional foreman on the Twinbrook project. Thesis has written absence policies, ECF No. 40-1

¶ 4, which foremen help to enforce. "Any employee who fails to maintain an acceptable attendance record will be subject to disciplinary actions, unexcused absence or tardiness may affect future promotions and/or raises." *Id.* It is reasonable to infer that when Ms. Tinoco told Mr. Lazo she was afraid not to show up at work, ECF No. 57-3 at 11, it was because she anticipated not being paid for the day and possibly being disciplined under the no-show policy. But Mr. Lazo, who a jury could find had the power to report her attendance that day, told Ms. Tinoco he would pay her for the day if she did not go into work so that they could have sex.

Even if a jury were to find that Mr. Lazo was not Ms. Tinoco's supervisor or did not take any tangible action, the finder of fact could find imputability under the negligence standard. Nelson Caceres, another Thesis foreman who was part of the management team, heard disparaging sexual comments about Ms. Tinoco but did not report the comments to higher-level management. ECF No. 39-11 ¶ 6. Moreover, a genuine issue of material fact exists as to whether Thesis's President took appropriate action after she heard an anonymous rumor about Ms. Tinoco's sexual habits and later learned through an investigation that the rumor was false. Although she apparently took steps to separate Mr. Amaya and Ms. Tinoco, the record does not include any evidence that she took steps to stop employees from spreading false rumors of a sexual nature about Ms. Tinoco. ECF No. 40-11 ¶ 4. Although the false rumor that Mr. Amaya and Ms. Tinoco were in a relationship was not disparaging on its face, a jury could find that it provided Ms. Spyridakis with constructive notice that false sexual rumors of a sexual nature were being spread about Ms. Tinoco. *Id.*

### b. *Faragher/Ellerth* **affirmative defense**

Fact issues preclude Thesis from prevailing as a matter of law on the hostile workplace claim based on the *Faragher/Ellerth* affirmative defense. For the Court to grant summary

judgment based on this defense, Thesis must demonstrate: "(a) that [it] exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that [Ms. Tinoco] unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher v. City of Boca Raton,* 524 U.S. 775 (1998).

Under the first prong, the employer must show that it exercised reasonable care to prevent and correct promptly any harassing behavior. *Id.* The adoption and distribution of an anti-harassment policy provides compelling proof that the company has exercised reasonable care in preventing sexual harassment. *See Barrett v. Applied Radiant Energy Corp.,* 240 F.3d 262, 266 (4th Cir.2001) (citations omitted). Here, it is undisputed that Thesis adopted and distributed an anti-discrimination policy. *See* ECF No. 40-1. The mere presence of an anti-discrimination policy, however, does not end the Court's inquiry. Indeed, if the plaintiff can show that the policy was "defective or dysfunctional," the presence of an anti-discrimination policy is no longer compelling proof that the company exercised reasonable care in preventing sexual harassment. *See Taylor v. Ritz Camera Centers, Inc.,* No. 99–3226, 2001 WL 34659521, at *3 (D.Md. Mar. 29, 2001) *aff'd,* 21 Fed.Appx. 160 (4th Cir.2001) (citing *Barrett,* 240 F.3d at 266). Thus, the existence of "such a policy only insulates an employer if it effectively was enforcing its policy." *Noel v. United Parcel Serv., Inc.,* No. 13–1138, 2014 WL 4452667, at *10 (D.Md. Sept. 9, 2014) (citing *Matvia v. Bald Head Isl. Mgmt., Inc.,* 259 F.3d 261, 268 (4th Cir.2001)). Here, a reasonable juror could conclude that Thesis's anti-harassment policy was defective or dysfunctional or that it was not being effectively enforced.

First, the sexual harassment policy was written in English and, viewing the facts in the light most favorable to Ms. Tinoco, Mr. Lazo could not read or understand it. ECF No. 57-2 at 10. When asked what was explained about the policy in Spanish, Mr. Lazo testified "well, she

18

says that this was – well I don't remember what it was. She just asked us to sign it." *Id.* Because the policy was not presented to Mr. Lazo in a way he could understand, *id.*, it was defective or dysfunctional.

Further, while it is true that once Ms. Spyridakis had actual knowledge of the offending conduct, Thesis investigated it, reprimanded Mr. Lazos, and held a sexual harassment training session, ECF No. 40-11 ¶¶ 14–19, there is a genuine question as to whether Thesis had constructive knowledge about the harassment earlier and whether Thesis's response "was reasonably calculated to end the harassment." *Brown v. Perry,* 184 F.3d 388, 396 (4th Cir.1999) ("[o]nce the employer has notice [of harassment], then it must respond with remedial action reasonably calculated to end the harassment"). That is because enough evidence exists to suggest that foremen like Mr. Lazos and Mr. Caceres were part of management, knew about the offending conduct, and did not take steps to report it up the chain. ECF No. 39-11 ¶ 6; ECF No. 57-1 at 18, 37–38. Additionally, although Ms. Spyridakis says that she confirmed that Ms. Tinoco and Mr. Lazo were not assigned to work on any of the same jobs going forward, ECF No. 40-11 ¶ 13, Ms. Tinoco testifies that she was assigned to a job site supervised by Mr. Lazo the very first time she was re-assigned work, ECF No. 57-1¶ 24–25. Even if this assignment was not deliberate, it is evidence that Thesis did not exercise reasonable care.

Because the facts needed to prove the *Faragher/Ellerth* defense's first element are genuinely in dispute, Thesis is not entitled to summary judgment on the hostile workplace claim.

### 2. Constructive Discharge

"In this circuit, the standard for constructive discharge requires a plaintiff to show both intolerable working conditions and a deliberate effort by the employer to force the employee to quit." *Johnson v. Shalala*, 991 F.2d 126, 131 (4th Cir. 1993). "Deliberateness can be

demonstrated by actual evidence of intent by the employer to drive the employee from the job, or circumstantial evidence of such intent, including a series of actions that single out a plaintiff for differential treatment." *Id*. Although genuine issues of material fact exist as to whether intolerable working conditions existed, Ms. Tinoco has not presented any evidence that suggests *a deliberate* effort by Thesis to force her to quit. While Ms. Tinoco introduced evidence that she was assigned to work under Mr. Lazo after she had complained to Thesis, no facts suggest that this assignment was intentional. Indeed, Ms. Spyridakis testified that she monitored the assignment schedule so that Ms. Tinoco and Mr. Lazo would not be assigned to work on any of the same projects. ECF No. 40-11 ¶ 13. Because Ms. Tinoco has not provided evidence to the contrary, she has failed to create a genuine issue of material fact on this issue and her constructive discharge claim cannot survive summary judgment.

### 3. Retaliation

To prove a retaliation claim, a plaintiff must demonstrate "(1) that she engaged in protected activity, (2) that an adverse employment action was taken against her, and (3) that there was a causal link between the protected activity and the adverse employment action." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 258 (4th Cir.1998). It is undisputed that Ms. Tinoco engaged in a protected activity when she complained about the widespread rumors and the unwelcome text messages she was receiving from Mr. Lazo. Ms. Tinoco also has introduced sufficient evidence to demonstrate that an adverse employment action was taken against her, mainly that her hours were drastically cut back after she reported the offending conduct. ECF No. 57-1 ¶ 23.

However, Ms. Tinoco cannot establish that a causal link exists between the protected activity and the adverse employment action. An employer may prevail on summary judgment if

it introduces evidence of a legitimate, non-discriminatory reason justifying the adverse action taken against the plaintiff. The plaintiff then "bears the ultimate burden of persuading the court that she has been the victim of intentional retaliation." *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015) (internal citations and brackets omitted). "In order to carry this burden, a plaintiff must establish both that the employer's reason was false and that retaliation was the real reason for the challenged conduct." *Id.*

Thesis introduced evidence that around the time that Ms. Tinoco's hours were cut, it reduced other employees' hours as well for a non-discriminatory, legitimate purpose. Specifically, Thesis demonstrated that it consistently reduces employees' hours between December and April when painting and wallpapering cannot be accomplished because project sites cannot be conditioned to at least 45 degree Fahrenheit. ECF No. 40-10 ¶ 8. Consistent with that historical practice, Thesis reduced the number of employees it had working in the field in early 2015. ECF No. 40-5. The timeframe for when Ms. Tinoco's hours were cut overlapped with this seasonal decline in Thesis's work. Further, during the relevant period, Thesis had two ongoing projects that required security clearances, which could be obtained only by American citizens. 40-10 ¶ 8. Because Ms. Tinoco was not an American citizen, Thesis could not offer her work on these two projects. *Id.* Thus, to the extent that Ms. Tinoco's hours were cut more than similarly situated employees', Ms. Tinoco's inability to get a required security clearance is a non-discriminatory, legitimate reason for this difference. Ms. Tinoco has not introduced any evidence demonstrating that Thesis's stated reasons for reducing her hours are mere pretext and the change in her hours was actually retaliatory.

In light of Ms. Tinoco's failure to "establish both that the employer's reason was false and that retaliation was the real reason for" the reduction in her hours, Thesis is entitled to summary judgment on the retaliation claim.

### 4. Punitive and Emotional Damages

"An award of punitive damages is allowed in a Title VII action when the plaintiff demonstrates that the defendant employer engaged in intentional discrimination with malice or with reckless indifference to the federally protected rights of" the plaintiff. *Anderson v. G.D.C., Inc.*, 281 F.3d 452 (4th Cir. 2002). Ms. Tinoco's punitive damages claim, therefore, cannot survive summary judgment for the same reasons that her constructive discharge claim fails at this stage. Although Ms. Tinoco may be able to persuade a jury that liability is imputed to Thesis under a strict liability or negligence standard, she cannot prove that Thesis engaged in "intentional discrimination with malice or with reckless indifference."

Ms. Tinoco's emotional distress damages claims, however, survive summary judgment because she has presented sufficient evidence to support an award for compensatory damages under the Montgomery County Code. *See Bryant v. Aiken Regional Medical Centers, Inc.* 333 F.3d 536, 546–47 (4th Cir. 2003). While Thesis correctly argues that Ms. Tinoco has not introduced enough evidence to prove an intentional infliction of emotional distress claim, she need not establish the elements of that tort to be awarded compensatory damages for emotional distress. Instead, "a plaintiff's testimony, standing alone, can support an award of compensatory damages for emotional distress" under Title VII if it, as here, establishes "that the plaintiff suffered demonstrable emotional distress," which is "sufficiently articulated. *Id.* (finding testimony that plaintiff suffered specific physical ailments sufficient to support an award of emotional distress). Ms. Tinoco describes suffering demonstrable emotional distress including

experiencing headaches, sleepless nights, and an irregular appetite. ECF No. 57-1 ¶ 13. Thus, her

emotional distress claims survive.


**IV.   CONCLUSION**

For the reasons stated above, the Court will deny Defendant's Motion to Strike

Declaration and In Limine, ECF No. 58, and deny in part and grant in part Defendant's Motion

for Summary Judgment, ECF No. 39. A separate order follows.


Dated: <u>September  24, 2018</u>                    _____/s/_____
                                                                      GEORGE J. HAZEL
                                                                      United States District Judge